## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Glenn Bowles,

     Plaintiff,

vs.

                                     Civil Action No.:
                                     Hon.

Macomb Community College, Macomb
County, Association of Adjunct Faculty
of Macomb Community College, and
Elizabeth Darga, in her official and
individual capacities,

     Defendants
_____/
Martin H. Leaf (P43202)
Martin H. Leaf PLLC
Attorney for Plaintiff
19641 Mack Ave.
Grosse Pointe Woods
Michigan, 48326
(248) 687-9993
leafmartin@gmail.com
_____/

## **<u>COMPLAINT AND JURY DEMAND</u>**

**NOW COMES** Glenn Bowles, by and through his attorney Martin Leaf, pursuant to the Fourteenth Amendments of the United States Constitution, and 42 U.S.C. §§ 1983 and 1988, seeking compensatory and punitive damages against the named Defendants, jointly and severally, and states:

## PRELIMINARY STATEMENT

This lawsuit involves the violation of the Plaintiff's procedural and substantive due process rights by the named Defendants, the violation of the duty of fair representation by the Plaintiff's collective bargaining agent, the wrongful discharge of the Plaintiff by his employer Macomb Community College, the tortious interference by the Macomb County Sheriff's Department with Plaintiff's contract rights under the collective bargaining agreement, and the defamation of Plaintiff and the tortious interference with his contract rights under the collective bargaining agreement by Defendant Darga.

## JURISDICTION AND VENUE

1.     This action arises under the Fourteenth Amendment of the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1983 and 1988.

2.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343, and supplemental jurisdiction over the Michigan state law claims under 28 U.S.C. §1367(a).

3.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. §1391 because the events giving rise to the claims detailed herein occurred in the Eastern District of Michigan.

## PARTIES

4.     Plaintiff Glenn Bowles is a retired law enforcement officer with twenty-five years experience who was employed by Defendant Macomb Community College as an adjunct instructor with the Macomb Police Academy (hereinafter "MPA") which is administered by Macomb Community College.  Plaintiff resides in Macomb County.

5.     Defendant Macomb Community College (hereinafter "MCC") is an accredited junior college located in Macomb County, Michigan.

6.     Defendant Association of Adjunct Faculty of Macomb Community College (hereinafter "AAFMCC") is the duly elected collective bargaining representative for all adjunct faculty employed by MCC.

7.     Defendant Macomb County is a governmental sub-division of the State of Michigan and is legally responsible for any constitutional torts or common law torts committed by the Macomb County Sheriff's Office and/or its employees.

8.     Defendant Elizabeth Darga is an Undersheriff employed by the Macomb County Sheriff's Office (hereinafter "MCSO").  Upon information and belief, Ms. Darga resides in Macomb County.

## FACTUAL ALLEGATIONS

9.     Plaintiff began his law enforcement career with the Wayne County Sheriff's Department in 1989. He was employed as a police officer by the Clinton Township Police Department beginning in 1991, until his retirement in 2012. After retirement Bowles was a part time training officer for the Memphis police department from 2016 until 2018.

10.     Plaintiff was employed by the MPA as an adjunct instructor in defensive tactics and firearms from 2006 through 2019.  During his tenure at the MPA no complaints of any kind were ever lodged against him and he was never subject to any disciplinary action.

11.     Plaintiff was one of the defensive tactic's instructors at the MPA for Police Academy Class #105, which commenced on January 14, 2019 and continued through the date of graduation on May 20, 2019.

12.     On May 16, 2019, officials from the MCSO met with the MPA leadership concerning a complaint that the MCSO received from several of it's cadets that attended Class #105.   The complaint was directed at Plaintiff.

13.     The MCSO representatives, to include Officers David Kennedy and Robert Doherty, started the meeting by stating there had been an "adversarial relationship" between the MCSO and Plaintiff arising from an incident which had occurred approximately 10 years earlier. At the time,

Plaintiff was breaking up with his then girlfriend.  The girlfriend retaliated by contacting the MCSO and accused Plaintiff of CSC and domestic violence. Defendant Darga was the officer in charge of the Detective Bureau at that time. Darga directed Officers Kennedy and Doherty to go to the Clinton Township Police Department and arrest the Plaintiff while on duty and in his uniform.  He was then lodged in the Macomb Jail that night. The Macomb County prosecutor later concluded there was no basis for the CSC charge and reduced the domestic violence charge to excessive noise in the home. Plaintiff pled nolo contendere.  Plaintiff discovered evidence that his former girlfriend made statements to others that she would falsely accuse Plaintiff of CSC to get him in trouble with his police department. Defendant **Darga has continued to carry a vindictive grudge against Plaintiff based on this incident.**

14.    At the May 16, 2019 meeting, with the Macomb Police Academy leadership, the MCSO officials alleged that Plaintiff engaged in disturbing conduct with one or more cadets during the academy's defensive tactics classes. They alleged that Plaintiff had inappropriately touched or harassed some students during drills involving ground fighting, along with the use of offensive and defensive tactics. The MCSO officials indicated

that they had initiated as investigation into the allegations and stated that if they found any evidence of wrongdoing by Plaintiff, they would present the evidence to the Macomb County prosecutor to have criminal charges assessed against Plaintiff. They also indicated that they would forward the results of their investigation to the MPA.

15.    Some time at the end of May, 2019, Darga contacted MPA Director Raymund Macksoud and requested the name of the MCC Human Relations (HR) Coordinator who was handling the MCSO complaint about Plaintiff.

16.    MCSO's investigation report was sent directly to the MCC HR office.

17.    On June 3, 2019, Macksoud was advised from MCC HR Vice President Denise Williams that she needed to talk with him concerning a complaint which had been received from the MCSO.

18.    On June 4, 2019, Macksoud received an email from MCC Dean Nara Mirijanian which stated that Plaintiff should not report to work, but should wait for a notification from HR as to his status.   Plaintiff was suspended from duty at this time.

19.    On June 5, 2019, a Title IX investigation relating to Plaintiff was initiated by MCC. MCC engaged HR Advantage investigator Kristin Baker to investigate the allegations brought forward by the MCSO.

20.    During the Title IX investigation, Baker asked Macksoud if he was aware of an incident at the academy where Plaintiff struck a cadet in the groin area which caused the cadet to drop a firearm that accidentally discharged. Macksoud told Baker that he was not aware of such an allegation and did not know of any negligent discharge induced by an instructor with a cadet in the police academy in his 30 + years association with the academy. He then asked Baker where she had obtained this information and she replied that it was provided by Darga. The incident never happened, and Darga manufactured the allegation as part of her vendetta program against Plaintiff, harkening back to her investigation of the false accusation by Plaintiff's ex-girlfriend that he had sexually abused her.

21.    On July 8, 2019, Danny Rosa from the Michigan Commission on Law Enforcement Standards (MCOLES), which is a state agency created pursuant to MCL 28.603, *et seq.* to establish standards for the licensing of law enforcement officers, sent an email to Macksoud advising him that, at the request of MCC VP Williams, Plaintiff was not to participate

in the August, 2019, police academy training.  This was done without providing Plaintiff without adequate notice of what he was being accused of and without offering him the opportunity to defend himself.

22.   On or about July 17, 2019, after MCOLES had opened an investigation into the cadets allegations, a representative of MCOLES made arrangements to interview the MCSO cadets from Class #105 at the MCSO facility. Between July 22-26, MCOLES representatives conducted in person interviews with the MCSO cadets at the MCSO office as part of their investigation. Cadets from other departments that were in this class were contacted by telephone for an interview.
.

23.   On September 16, 2019, Plaintiff received an email from MCC stating that the Title IX investigation had been completed and that none of the allegations had been substantiated. (Copy of email attached as Exhibit 1) The following statement was included in the email:

> Please note, however, that this conclusion regarding Title IX does not mean that conduct identified during this course of the investigation did not violate other college policies, procedures, or standards. The interim measure of suspension remains intact until further notice.

24.   On September 16, 2019, Darga and Williams sent separate emails to MCOLES requesting a copy of its investigation of Plaintiff.

25.   On September 24, 2019, Plaintiff was interviewed by MCOLES representatives Danny Rosa and Gretchen Gallaway.   Plaintiff told the interviewers that the MCC Title IX investigation had concluded that the allegations against him had not been substantiated. Rosa responded that he was not interested in the Title IX investigation results and that he had seen neither the Title IX final report nor the MCSO complaint relating to Plaintiff.   When Plaintiff offered past class evaluations of his training instruction, Rosa stated he was not interested in seeing the evaluations. When Plaintiff offered the interviewers affidavits concerning a real-life street encounter and why he taught certain tactics, Rosa declined to look at the affidavits. The affidavits established that Bowles was instructing using realistic street conditions from personal experience knowledge regarding distraction techniques involving groin strikes and tickling.   Rosa refused to accept any documents, including the affidavits, and favorable critiques by some of the same Cadets trained using the same techniques that they later complained about (Some of the cadets from class #105 took a similar class when they were cadets for the Corrections Academy) . Rosa told Bowles that MCOLES did not intend to interview any of the other MPA instructors regarding the allegations against Plaintiff.

26.    Rosa told Plaintiff that he had heard that Plaintiff was not allowed to work on the firearms range because he had struck someone in the groin, who then dropped a weapon that discharged. Plaintiff denied the allegation and asked what the source of Rosa's information was. Rose refused to reveal the source. Rose concluded the meeting telling Plaintiff that the results of the MPA investigation would be forwarded only to Macksoud and not to MCC or MCSO.

27.    Between September and December, 2019, Darga sent four requests to MCOLES requesting the results of their investigation relating to Plaintiff. In the last email dated December 4, 2019, without knowing what the investigation results were, she stated: "I am requesting a copy of your completed investigation into the misconduct committed at the Macomb Police Academy. It has been almost five months since you interviewed our employees. Our employees who were mistreated/victimized by MCOLES certified instructor Glenn Bowles deserve an explanation of the findings by your agency."  (Copy of email attached as Exhibit 2)

28.    On December 18, 2019, Macksoud met with Rosa, who provided Macksoud with a briefing as to the findings of the MCOLES investigation and stated  that he would have the written Investigative Summary and the Class #105 Closeout Report sent to him within a few

days. Rosa indicated that he was meeting with Williams and Darga that afternoon to provide them a briefing regarding the findings. He told Macksoud that he was not going to provide either Williams or Darga with a copy of the written report.

29.    Macksoud received the MCOLES investigative summary on December 23, 2019. The summary concluded that Plaintiff was deemed unfit to instruct in an MCOLES approved basic training academy and was prohibited from doing so in the future. Macksoud only forwarded  the results of the summary to PSI (Public Service Institute)  Director Michael Lopez.

30.    Plaintiff is a member of the Association of Adjunct Faculty of Macomb Community College.  The AAFMCC and MCC are parties to a collective bargaining agreement ("CBA").  (Copy of CBA is attached as Exhibit 3)  Sections 7.3 and 7.4 of the CBA state:

7.3    Except as provided in subsections 5.10, 6.18, and 7.2, discipline or discharge of an adjunct teacher may be only for just cause after charges, notice and hearing.  All such charges shall be in writing, signed by the appropriate administrator, and filed with AAFMCC and the adjunct teacher.  The doctrine of progressive discipline shall be observed.

7.4    Disciplinary interviews of an adjunct teacher must be held in private and shall remain confidential. The teacher and the AAFMCC shall be notified at least one (1) calendar day in advance of the nature of such interviews and be informed of the right to AAFMCC representation.  If the adjunct teacher chooses to have AAFMCC

representation, the administration may elect to have representation present at the interview.  AAFMCC shall be notified in writing of the nature and disposition of the case.

31.   On February 14, 2020, Plaintiff was summoned to meet Williams and was verbally advised that students in the Class #105 had made allegations that Bowles had engaged in inappropriate touching of cadets, and use of excessive force.  Plaintiff was not provided with the identity of the cadets making the allegations, nor was he provided with a written list of the specific charges which were being made against him, as required by Section 7.3 of the CBA.  Rather than being provided with a written list of the charges being made against him, he was given the opportunity to review the summary of findings.  Plaintiff denied the generalized allegations which were leveled against him and explained that all of the training techniques he used were approved by the training manuals which were used at the academy.

32.   On February 14, 2020, Williams sent a letter to Plaintiff which stated, in relevant part: "We find it necessary to terminate your employment, effective immediately.  Please return all college keys, any college equipment you may have and your ID badge to the Department of Human Resources … ."  (Copy of letter attached as Exhibit 4.)

33.    Williams told Bowles via the union representative that MCC would allow Bowles to resign if Bowles agreed not to sue the college. However, MCC had been aware for six weeks that MCOLES had made the decision to terminate Bowles ability to teach. This offer to resign is illusory – apparently MCC was trying to avoid a lawsuit, in exchange for offering nothing of value to Plaintiff Bowles.

34.    Plaintiff requested that the Association file a grievance challenging his termination.  On February 28, 2020, the AAFMCC sent a letter to Plaintiff indicating that it would not file a grievance contesting his termination.  (Copy of letter attached as Exhibit 5)

35.    On November 14, 2020, Plaintiff sent a letter to Darga asserting that her statement in the email which she sent to the MCOLES on December 4, 2019, asserting that Plaintiff had "mistreated/victimized" cadets at the academy was false and defamatory.  He demanded a retraction pursuant to MCL §600.2911.  (Copy of letter attached as Exhibit 6)

36.    On November 17, 2020, Corporation Counsel for the MCSO sent Plaintiff a letter indicating that Darga was refusing to issue a retraction. (Copy of letter attached as Exhibit 7)

37.    As a result of his termination, the violation of his constitutional due process rights, the violation by the Association of its duty of fair representation, and the tortious acts committed by Darga and the MCSO, Plaintiff has suffered the loss of compensation and benefits, and has suffered extreme emotional distress.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS UNDER 42 U.S.C. §1983 BY MACOMB COMMUNITY COLLEGE

38.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

39.    42 U.S.C. §1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

40.    Under the express terms of Section 7.2 of the CBA, Plaintiff could not be disciplined or terminated except for just cause.    Plaintiff therefore had a protected property interest in his continued employment under the 14th Amendment.    He could not be deprived of that property

interest without procedural due process, which required that he be provided notice of the charges against him and an opportunity to be heard.  This in turn required that he be afforded either a pre-termination or post-termination evidentiary hearing at which he could confront the individual students who made the allegations against him and call witnesses in his defense.

41.   The MCC afforded Plaintiff neither a pre-termination nor a post-termination evidentiary hearing, and in so doing violated Plaintiff's right to procedural due process protected under the 14th Amendment.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against MCC; that the Court award Plaintiff costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT II

## VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS PROTECTED BY THE FOURTEENTH AMENDMENT UNDER 42 U.S.C. §1983 BY DEFENDANT DARGA IN HER OFFICIAL AND INDIVIDUAL CAPACITIES

42.   Plaintiff incorporates herein each and every of the prior

averments as if fully stated herein.

43.     By pursuing a vendetta against Plaintiff based on events which had occurred ten years earlier, manufacturing and disseminating a false claim that Plaintiff had struck a cadet in the groin, causing him to drop his weapon which then accidentally discharged and instigating an investigation of Plaintiff based on false claims that he had mistreated cadets, Darga acted arbitrarily and capriciously in a manner that "shocks the conscience."

44.     Darga, acting under color of law, has thereby violated Plaintiff's substantive due process rights protected under the 14th Amendment.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against Darga in her official and individual capacities; that the Court award Plaintiff costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT III

## VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS PROTECTED BY THE FOURTEENTH AMENDMENT UNDER 42 U.S.C. §1983 BY THE MACOMB COUNTY SHERIFF'S OFFICE

45     Plaintiff incorporates herein each and every of the prior

averments as if fully stated herein.

46.    Undersheriff Darga's official status in the MCSO gave her policy making authority and her actions are accordingly attributable to the MCSO for purposes of the 14th Amendment.

47.    Macomb County is accordingly liable to Plaintiff for the actions she took in pursuing her vendetta against Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against Macomb County; that the Court award Plaintiff costs and reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## PENDENT STATE CLAIMS

## COUNT IV

## VIOLATION OF THE DUTY OF FAIR REPRESENTATION BY THE ASSOCIATION OF ADJUNCT FACULTY OF MACOMB COMMUNITY COLLEGE

48.    Plaintiff incorporates herein each and every of the prior

averments as if fully stated herein.

49.    As the exclusive collective bargaining representative for the adjunct faculty employed by MCC, the AAFMCC owed Plaintiff a duty of fair representation.

50.    By refusing to pursue a grievance against MCC for its flagrant violation of Section 7.3 of the CBA, as evidenced by the failure of MCC to provide Plaintiff with a written notice of the charges being made against him; failing to provide him with an evidentiary hearing; terminating him without just cause based on hearsay statements in a report prepared by the MCOLES; and failing to implement progressive discipline, the AAFMCC acted arbitrarily and in bad faith, thereby violating its duty of fair representation to Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against the AAFMCC, and that the Court award Plaintiff costs and reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT V

## WRONGFUL TERMINATION BY MACOMB COMMUNITY COLLEGE

51.  Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

52.  Since the AAFMCC violated its duty of fair representation owed to Plaintiff, Plaintiff is entitled to enforce the terms of the CBA against MCC.

53.  MCC violated the terms of the CBA by failing to provide Plaintiff with written notice of the charges being made against him; by failing to afford him an evidentiary hearing; by terminating his employment without just cause, based on a report containing multiple hearsay statements; and by failing to implement progressive discipline against him.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against MCC, and that the Court award Plaintiff costs and reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VI

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP BY DARGA IN HER INDIVIDUAL CAPACITY

54.  Plaintiff incorporates herein each and every one of the prior

averments as if fully stated herein.

55.    Plaintiff was a third-party beneficiary of the CBA between MCC and AAFMCC.

56.    MCC breached the CBA by terminating Plaintiff without just cause based on hearsay allegations contained in the report prepared by the MCOLES.

57.    Darga promoted the investigations conducted by the MCSO and the MCOLES based on a 10-year vendetta campaign she conducted against Plaintiff and by manufacturing and disseminating false claims, such that Plaintiff had struck a cadet in the groin, resulting in the accidental discharge of a weapon.

58.    By her actions, Darga instigated an unjustified breach of the CBA by MCC and thereby tortiously interfered with Plaintiff's rights under the CBA.

59.    In engaging in her actions, Darga did not act in good faith, but acted maliciously and for an improper purpose, and therefore is not entitled to governmental immunity.

    **WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's

compensatory, exemplary and punitive damages against Darga, and that the Court award Plaintiff costs and reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## **COUNT VII**

## **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP BY DARGA IN HER OFFICIAL CAPACITY AS AN EMPLOYEE OF MACOMB COUNTY**

60. Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

61. Darga, as Undersheriff, is a policy making officer in the MCSO.

62. In engaging in her tortious interference with Plaintiff's rights under the CBA, and with malice and an improper purpose, she did so with the full knowledge and approval of her superiors within the MCSO.

63. Macomb County, by operation of law, is liable for the tortious acts committed by a policy-making employee of the MCSO.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against Macomb County, and that the Court award Plaintiff costs and reasonable attorney fees; and

grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VIII
## LIBEL BY DARGA

64.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

65.    Darga's statement in her December 4, 2019 email that Plaintiff mistreated/victimized cadets at the academy was false and defamatory and constituted libel.

66.    The statement is a statement of fact, and is not excusable as a statement of mere opinion.

67.    Darga published the libelous statement with actual malice and with a reckless disregard for the truth.

68.    Plaintiff is neither a public official nor a public figure.

69.    Having received a demand from Plaintiff in writing that she retract the false and libelous statement, Darga has refused to retract the statement.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory, exemplary and punitive damages against Darga; award Plaintiff costs and

reasonable attorney fees pursuant to M.C.L. 600.2911(7); and grant Plaintiff such other and further relief as the Court may deem just and proper.

By:     /s/ Martin Leaf (P43202)
        Attorney for Plaintiff
        19641 Mack Ave.
        Grosse Pointe Woods, MI 48236
        (248) 687-9993
        Leafmartin@gmail.com

Dated: December 2, 2020

## JURY DEMAND

Plaintiff hereby demands a jury trial for all issues triable by a jury.

By:     /s/ Martin Leaf (P43202)
        Attorney for Plaintiff
        19641 Mack Ave.
        Grosse Pointe Woods, MI 48236
        (248) 687-9993
        Leafmartin@gmail.com

Dated: December 2, 2020

**BOWLES v. MACOMB COMMUNITY COLLEGE, ET AL.**
**INDEX OF EXHIBITS**

Exhibit 1          Title IX investigation conclusion letter, September 9, 2019

Exhibit 2          Email sent by Elizabeth Darga to Gretchen Galloway,
                   December 4, 2019

Exhibit 3          Copy of Collective Bargaining Agreement between
                   Macomb Community College and the Association of
                   Adjunct Faculty of Macomb Community College

Exhibit 4          Letter of termination, February 14, 2020

Exhibit 5          Letter from AAFMCC to Bowles indicating it was not going
                   to grieve his termination, February 28, 2020

Exhibit 6          Letter from Bowles to Darga demanding a retraction

Exhibit 7          Letter rejecting demand for retraction, November 17,
                   2020

# Exhibit 1
# Title IX Investigation Conclusion
# Letter, September 9, 2019

 **Macomb Community College**
Education • Enrichment • Economic Development

Vice President of Student Services

Via email

September 9, 2019

**PERSONAL AND CONFIDENTIAL**

Dear Glenn Bowles:

Thank you for your patience and cooperation as the college has worked to conduct a thorough, neutral investigation into the allegation that several cadets in the Corrections and Police Academies were subjected to sexual harassment in violation of the college's Title IX policy. This letter is intended to inform you of the outcome of that investigation, which is stated in the "conclusion" section of this letter.

On May 16, 2019, Macomb Community College received knowledge alleging certain behaviors that may violate the College's Title IX policy. Specifically, that you had touched academy cadets inappropriately during class. On June 4, 2019, Macomb Community College received a report from the Macomb County Sheriff's Department outlining the specifics of the allegations. The College promptly commenced an investigation to determine if you violated its Title IX policy.

In addition, the following "interim measures" were implemented:

- You were suspended from your duties as an instructor pending the outcome of the investigation.

Title IX of the Education Amendments of 1972 (Title IX) is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. The College has jurisdiction to investigate and take certain actions with respect to reports of Title IX violations, as outlined in the administrative policy entitled, "Policies and Procedures for Responding to Reports of Sexual Harassment and Sexual Misconduct." The complete policy is available at www.macomb.edu/titleix.

**Definition:**

Macomb Community College's "Unlawful Harassment Policy" defines "sexual harassment" as:

> (b) unwelcome verbal or physical acts that are based on sex that are so severe and pervasive that they objectively either (i) have the effect of unreasonably interfering with an individual's work or academic performance, or (ii) create an intimidating, hostile or offensive learning or working environment

**Standard of Proof:**
In order to determine if the responding party has violated the Title IX Policy, the standard of proof required is "preponderance of evidence."

Section 4.6 of the Title IX Policy, entitled "Standard of Proof" states:

> The investigator's findings will be made using the preponderance of the evidence standard. This standard requires that the information supporting a finding of responsibility be more convincing than the information in opposition to it. Under this standard,

individuals are presumed not to have engaged in sexual misconduct or retaliation unless a preponderance of the evidence supports a finding that sexual misconduct or retaliation occurred.

**Overview of Investigation:**
Interviews were conducted with 35 individuals, including the responding party, 13 faculty and staff from the Public Service Institute, and 21 students from the Corrections Academy (completion December 2018) and Police Academy (completion May 2019).

The College also reviewed the Macomb County Sheriff's Department Written Report, which is referenced above.

**Conclusion:**

Based on the results of this investigation and utilizing a "preponderance of the evidence" standard, the college has determined that there is insufficient evidence to find that you violated college policies related to Title IX. Please note, however, that this conclusion regarding Title IX does not mean that conduct identified during the course of the investigation did not violate other college policies, procedures, or standards. The interim measure of suspension remains intact until further notice.

**Right to Appeal**

Please note, you have the right to appeal this decision to the College Disciplinary Panel. Written notice of appeal shall be filed with the Title IX Coordinator within ten days of the date of this decision. The Notice of Appeal shall state with specificity why this decision should not stand. A review of the decision must be sought on the following grounds:

a. A material deviation from the procedures affected the outcome of the case;
b. There is new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation that could reasonably affect the investigation findings;
c. The sanctions, interventions and/or remedies are inappropriate or disproportionate to the determined violation(s); or
d. A review of all available and relevant information indicates that the evidence clearly does not support the finding(s) and provides firm and definite support for modifying the original finding(s).

Notice of appeals may be sent to my attention at titleix@macomb.edu or at Macomb Community College, 14500 E 12 Mile Road, Warren, MI 48088.

Pending the absence of an appeal, the matter specific to Title IX is now closed.

Should you have any questions, feel free to contact me at titleix@macomb.edu or at (586) 445-7242.

Sincerely,

Jill M. Thomas-Little
*Title IX Coordinator*

# Exhibit 2
# Email sent by Elizabeth Darga to Gretchen Galloway, December 4, 2019

**From:** Elizabeth Darga <Elizabeth.Darga@macombcountymi.gov>
**Sent:** Wednesday, December 4, 2019 8:25 AM
**To:** Galloway, Gretchen (MSP) <GallowayG@michigan.gov>
**Cc:** Anthony Wickersham <Anthony.Wickersham@macombcountymi.gov>; Andrew McKinnon
<andrew.mckinnon@macombgov.org>; Karlyn Semlow <karlyn.semlow@macombgov.org>
**Subject:** RE: MCOLES Investigation

Hello Gretchen,
I am requesting a copy of your completed investigation into the misconduct committed at the Macomb Police
Academy.  It has been almost five months since you interviewed our employees.  Our employees who were
mistreated/victimized by MCOLES certified instructor Glen Bowles deserve an explanation of the findings by
your agency.
Thank you.

# Exhibit 3
# Copy of Collective Bargaining Agreement Between Macomb Community College and the Association of Adjunct Faculty of Macomb Community College

# AGREEMENT

### Between the

# BOARD OF TRUSTEES

### Of the

# COMMUNITY COLLEGE DISTRICT

### Of the

# COUNTY OF MACOMB

### And the

# ASSOCIATION OF ADJUNCT FACULTY OF MACOMB COMMUNITY COLLEGE

## 2012-2018



# TABLE OF CONTENTS

| | | |
|---|---|---|
| SECTION 1 | RECOGNITION | 4 |
| SECTION 2 | AUTHORITY OF THE BOARD OF TRUSTEES | 4 |
| SECTION 3 | BOARD OF TRUSTEES-AAFMCC RELATIONSHIP | 5 |
| SECTION 4 | SELECTION OF ADJUNCT TEACHERS | 7 |
| SECTION 5 | TEACHING QUALIFICATIONS | 10 |
| SECTION 6 | EVALUATION OF PERFORMANCE | 11 |
| SECTION 7 | PERFORMANCE ISSUES AND MISCONDUCT | 13 |
| SECTION 8 | TEACHING RIGHTS AND RESPONSIBILITIES | 13 |
| SECTION 9 | PERSONNEL FILE | 15 |
| SECTION 10 | WORKLOAD LIMITS | 16 |
| SECTION 11 | CONFLICT OF INTEREST | 16 |
| SECTION 12 | GRIEVANCE PROCEDURE | 17 |
| SECTION 13 | SERVICE COMMITTEE | 18 |
| SECTION 14 | SEVERABILITY, SCOPE OF AGREEMENT, AND NO STRIKE/NO LOCKOUT PLEDGE | 19 |
| SECTION 15 | PAY RATES | 20 |
| SECTION 16 | ASSOCIATION DUES / AGENCY SHOP | 21 |
| SECTION 17 | TERMINATION AND MODIFICATION | 22 |
| APPENDIX A – ADJUNCT FACULTY EVALUATION FORM | | 25 |

# AGREEMENT
# BETWEEN
## THE BOARD OF TRUSTEES OF
## THE COMMUNITY COLLEGE DISTRICT OF
## THE COUNTY OF MACOMB

### and

## ASSOCIATION OF ADJUNCT FACULTY
## OF MACOMB COMMUNITY COLLEGE

This Agreement is made on March 19, 2013 by and between the Board of Trustees of the Community College District of the County of Macomb (hereinafter called "the Board") and the Association of Adjunct Faculty of Macomb Community College, (hereinafter referred to as AAFMCC)

## PREAMBLE

The Board and AAFMCC have a statutory obligation, pursuant to Act 336 of the Michigan Public Acts of 1947, as amended, to bargain in good faith with respect to hours, wages, terms and conditions of employment.

Therefore, it is agreed:

## PURPOSE AND INTENT

The general purpose of this Agreement is to establish the wages, hours, and terms and conditions of employment and to promote orderly and peaceful labor relations for the mutual interests of Macomb Community College and AAFMCC.

The parties recognize that a sound educational program is a primary objective of the College.  The parties also recognize that an important element in the relationship between the Board and AAFMCC in meeting the diverse and changing needs of the community, students, and clients the College serves is to provide for a process for change.  Each new effort should be considered as a building block to the future.  The parties acknowledge their commitment to this joint process.  We recognize the freedom to present views or proposals for consideration. To facilitate a process for change, the parties recognize that the contract needs to provide flexibility from time to time for innovation in educational programs and/or services.

The parties acknowledge that trust is a shared responsibility and is the cornerstone of any relationship.  Efforts will be made by administrators and faculty to maintain

communication and collaboration.  Maintaining and enhancing the quality of the curriculum, instruction, and services is essential to student learning and success.

To these ends, the Board and AAFMCC encourage to the fullest degree friendly and cooperative relations between the respective representatives at all levels and among all adjunct faculty members.

## SECTION 1
## RECOGNITION

1.1    The Board recognizes the Association of Adjunct Faculty of Macomb Community College as the sole and exclusive bargaining agent, as defined in Act 379 of the Michigan Public Acts, 1965, for all adjunct teachers employed by Macomb Community College, excluding administrators, supervisory personnel, anyone represented by another labor organization at the College, and all other college employees.

1.2    College employees who are excluded from the bargaining unit under subsection 1.1 may be employed as adjunct teachers and treated the same as bargaining unit members under Section 4, below.

1.3    The Board agrees not to recognize or negotiate with any teacher organization or individual other than AAFMCC on matters concerning wages, hours, terms and conditions of employment of bargaining unit members for the duration of this Agreement or during any extension of this Agreement.

1.4    Any adjunct teaching position not included in, nor specifically excluded from the bargaining unit in subsection 1.1 must be subjected to negotiation between the Board and AAFMCC to determine whether such position should be included in the bargaining unit. It shall be the responsibility of the VP of Human Resources to advise the president of AAFMCC in writing of postings of all new positions.

1.5    No administrative duties shall be added to any position within the bargaining unit that has the effect of removing such position from the bargaining unit without prior negotiation and agreement with AAFMCC.

## SECTION 2
## AUTHORITY OF THE BOARD OF TRUSTEES

2.1    Except as expressly and specifically limited by this Agreement, the Board, on its own behalf and on behalf of the electors of the Board, hereby retains and reserves unto itself all powers, rights, authority, duties and responsibilities conferred upon and vested in it by the laws and the constitutions of the State of

Michigan and the United States, including—but without limiting the generality of the foregoing—the right to:

- the executive management and administrative control of the College and its properties and facilities;
- hire and evaluate all employees and determine their qualifications and the conditions for their employment, including discipline or discharge;
- determine the methods, means and number of personnel by which operations are to be conducted;
- schedule the academic year and to create, schedule, modify or eliminate courses;
- establish and enforce policies, rules, and regulations as it may deem best for the purpose of maintaining order, safety, and the efficient and effective operation of the College's programs and facilities;
- take such actions as may be necessary to carry out the missions of the College in the case of emergency.

2.2   The exercise of the foregoing powers, rights, authority, duties and responsibilities by the Board, the adoption of policies, rules, regulations and practices in furtherance thereof, and the use of judgment and discretion in connection therewith shall be limited only by the specific and express terms of this Agreement and then to the extent such specific and express terms hereof are in conformance with the Constitution and laws of the State of Michigan and the Constitution and laws of the United States.

2.3   The term "Board," as used in this Agreement, refers to the Board itself and the administrators designated by the Board to act as its agents.

## SECTION 3
## BOARD OF TRUSTEES – AAFMCC RELATIONSHIP

3.1   The Board shall make available to AAFMCC, upon request, all statistics and financial information in its possession that is necessary for negotiation of a new collective bargaining agreement.

3.2   The president of AAFMCC shall be furnished with an electronic version of the agenda of each public meeting of the Board with all non-confidential attachments at the same time regular distribution is made. Such agendas with non-confidential attachments are also available in the library of each campus and shall be posted without attachments in each department unless the Board adopts a policy to post on the internet.

3.3   The president of AAFMCC shall be furnished with an electronic version of the approved minutes of each public meeting of the Board at the

same time regular distribution is made. Such minutes shall also be made available in the library at each campus.

3.4    Items requested by the president of AAFMCC shall appear on the Board agenda provided written notification of the nature of such items is submitted to the office of the College president at least seven (7) work days preceding the date of a regularly scheduled meeting. However, this provision shall not be used as a means of circumventing the grievance procedure of this Agreement.

3.5    Board – AAFMCC arrangements described in subsection 3.4 shall not preclude appearances before the Board by an adjunct teacher acting on his or her own behalf on issues other than wages, hours, working conditions, or grievances. An adjunct teacher wishing to appear before the Board shall submit a written statement to the office of the president of the College detailing the nature of the matters to be presented at least seven (7) work days preceding the date of a regularly scheduled meeting. The teacher may also submit a copy to the president of AAFMCC if he or she so chooses.

3.6    Adequate rooms at the College shall be provided for AAFMCC meetings and special programs, provided that the arrangements are made at least five (5) calendar days in advance with the administration, and provided that no cancellation of the instructional program will result. AAFMCC members shall have the right to transact AAFMCC business on school property provided such activities do not obstruct instructional programs.

3.7    The College shall work with the AAFMCC to attempt to provide office and conference room space at either South or Center Campus. It is understood that the decision to provide space shall be at the College's discretion. A telephone with voice mail, a computer and access to the College network shall be provided in the office of AAFMCC, when and if such space is provided. The AAFMCC prefers that if such space is made available that it be at Center Campus.

3.8    AAFMCC shall have the right to use designated College bulletin boards, faculty mailboxes, and e- mail to communicate with its members in each area provided all communications are clearly identified as originating from AAFMCC.

3.9    Members of the bargaining unit shall not suffer a loss of pay if, by mutual agreement of the Board and AAFMCC, they participate during working hours in conferences and meetings with the administration that involve or derive from this Agreement.

3.10   The Board shall pay the cost of academic dress for adjunct teachers participating in commencement exercises. Such participation is encouraged, but shall be voluntary.

3.11   The Board shall provide a "load report" in electronic spreadsheet format to the AAFMCC one (1) time per month which shall contain a listing of the adjuncts employed as well as a list of assignments.

3.12   The Board shall make a reasonable effort to notify adjunct teachers promptly whenever there is an official closing of the College because of natural disaster, inclement weather, or other cause.

# SECTION 4
## SELECTION OF ADJUNCT TEACHERS

Preamble:  The spirit of Section 4 is to provide for the staffing of classes with the goal of enhancing the opportunity for student success. This goal is achieved when adjunct teachers and the college strive to meet their respective contractual obligations in good faith, each respecting the other in the process of the assignment of classes.

4.1   The immediate supervisor may offer teaching assignments to qualified candidates only after full-time teachers have selected their base and extra-contractual loads.

4.2   An adjunct teacher shall inform the immediate supervisor of his or her availability to teach specifying the days of the week and hours of availability by the third (3rd.) Monday in September for the winter term and the third (3rd.) Monday in March for the spring/summer and fall terms. An adjunct teacher who fails to provide timely notification shall forfeit his or her rights under this Section for the upcoming term.

4.3   If Engineering and Advanced Technology (EAT) administration require full-time faculty to select their workload for the winter term by the third (3rd) Monday in September, and their workload for the spring/summer and/or fall term by the third (3rd) Monday in March, then adjunct faculty in EAT should be assigned in accordance with this Section 4. All adjunct teachers in EAT shall inform the immediate supervisor of their availability to teach pursuant to subsection 4.2.

4.4   Subject to limitations imposed by load restrictions, including the yearly hard cap set forth in Section 10.1, the available supply of sections, and the qualifications required by Section 5, below, the immediate supervisor shall offer to each adjunct teacher in seniority order two (2) tentative assignments, at the teacher's option, in each term, no less than sixty (60) calendar days prior to the first day of classes in the fall and winter term and no less than thirty (30) calendar days prior to the first day of classes in the spring/summer term.

4.5    Subject to the yearly hard cap set forth in Section 10.1.a, all remaining class sections will be offered to qualified adjunct faculty on the roster based on their declared availability before a new adjunct teacher may be hired in the discipline.

4.6    For the purposes of subsections 4.4 and 4.5, two assignments will be treated as a single assignment if each assignment consists of two (2) equated hours or less.

4.7    All tentative assignments are subject to class cancellation and selection by full-time teachers under the terms of the collective bargaining agreement with the full-time teachers.

4.8    When an adjunct teacher's assigned class is cancelled or reassigned to a full-time teacher 10 or more calendar days prior to the first day of classes, and as a result is left with less than two (2) assignments for fall and winter term, or left with no assignment in summer term, the adjunct teacher shall have the right of reassignment to an unassigned section, or to another adjunct teacher's assigned section in order of seniority. The immediate supervisor shall make a good-faith effort to notify the adjunct teacher of the class cancellation and the replacement assignment. The adjunct teacher must exercise this right of reassignment within 24 hours of notification and confirm acceptance of the reassignment by email to the supervisor or the right of reassignment is lost. If the loss of a class occurs 5-9 calendar days prior to the first day of classes, then at the discretion of the immediate supervisor, the adjunct teacher may be given the opportunity for a reassignment to an unassigned section, or to another adjunct teacher's assigned section in order of seniority.  There shall be no right of reassignment four (4) calendar days or less prior to the first day of classes.

4.9    Once reassignment takes place, an adjunct teacher's load will not exceed two (2) assignments for Fall or Winter term or one (1) assignment for Spring/Summer term or the yearly hard cap set forth in Section 10.1.  An adjunct teacher whose assignment(s) are cancelled or reassigned to a full-time teacher, and, as a result, is left with two (2) or more assignments, will not have the right of reassignment.

4.10   In spring/summer term, an adjunct teacher whose assignment(s) is/are cancelled or reassigned to a full-time teacher and, as a result, is left with no assignment will have the right of reassignment in seniority order. Once reassignment takes place for spring/summer term, an adjunct teacher's load will not exceed one (1) assignment or the yearly hard cap set forth in Section 10.1. An adjunct teacher, whose assignment(s) is/are cancelled or reassigned to a full-time teacher, and, as a result, is left with one (1) assignment, will not have the right of reassignment.

4.11   An adjunct teacher that has an initial assignment(s) lost to an adjunct teacher with higher seniority shall not have the right to reassignment, regardless of how many assignments, if any, that adjunct teacher has remaining.

4.12   An adjunct teacher that accepts an assignment and thereafter withdraws from that assignment fifteen (15) calendar days or less before the start of class is only eligible for a single assignment if the next term is fall or winter, or eligible for no assignment if the next term is spring/summer. An adjunct teacher that accepts an assignment and thereafter withdraws from that assignment fifteen (15) calendar days or less before the first day of classes, and does so two (2) times in a period of three (3) academic years will be removed from the roster of candidates and be ineligible to teach at the College in future semesters. The adjunct's immediate supervisor may excuse a withdrawal based upon extenuating circumstances.

4.13   In the event that an adjunct teacher who had previously accepted two (2) or more assignments is left with only one (1) assignment, under any circumstances,  shall have the right to withdraw from that one remaining assignment within 24 hours of notification of  the loss of assignment(s) without the application of subparagraph 4.12.

4.14   Seniority in a discipline shall be based on an adjunct teacher's date of hire by the College. This seniority date shall be adjusted to reflect any break in service in the discipline that exceeds two (2) years. Adjunct teachers first hired prior to January 1, 1986, shall have a disciplinary seniority date of January 1, 1986, prior to any adjustment. In the event that adjunct teachers have the same date of hire, the number of equated hours taught shall be the deciding factor. An adjunct teacher who has had a break in service that exceeds three years will be removed from the seniority list. Should the adjunct teacher be re-hired by the college, his or her seniority date shall be adjusted to reflect the break in service, and, in accordance with Section 15, he or she will be placed back on the step occupied prior to the adjunct teacher's removal from the seniority list.

4.15   Seniority for adjunct faculty is campus specific (i.e. South Campus, Center Campus, East Campus, and MTEC), except for district wide disciplines or when specified in the discipline plan.

4.16   The Board shall provide AAFMCC with an updated seniority list of all adjunct teachers on July 1 for use in scheduling the fall term, on November 15 for use in the winter term, and on March 15 for the Spring/Summer term. The list shall indicate the date of hire and the amount of seniority in the adjunct teacher's discipline(s). Disputes concerning the accuracy of the list shall be filed with the director of human resource management within twenty (20) calendar days of publication of the list. Should there be  no satisfactory resolution within twenty

(20) calendar days of the filing of the dispute the adjunct teacher shall have the right to initiate a grievance at step 3 of the grievance procedure. For winter term 2013, the seniority list shall be provided as soon as may be reasonably prepared following this agreement being effective.

4.17   Participation in an administratively prescribed orientation program is mandatory for adjunct teachers employed for the first time.

4.18   All adjunct teaching assignments shall be made without discrimination as to sex (including sexual harassment), race, age, color, religion, national origin or ancestry, sexual orientation, political beliefs, marital status, or membership or participation in any political, professional, or union organization.

## SECTION 5
## TEACHING QUALIFICATIONS

5.1   The minimum general qualification requirement for Arts and Sciences general education courses shall be a master's degree in subject matter directly related to the course to be taught, a master's degree in another field and twenty (20) graduate semester hours in the discipline (which may be part of the master's degree course work), or thirty (30) graduate semester hours in the teaching discipline as a part of a program leading to a degree higher than a master's degree.

5.2   The minimum general qualification requirement for Career Preparation occupational education courses shall be a master's degree in subject matter directly related to the course to be taught or a combination of formal education, specialized training, and recent experience which equates to a master's degree.

5.3   Adjunct teachers of courses that are designed to present and develop occupational skills shall have at least two (2) years of experience in the occupational area concerned.

5.4   For certain courses of a specialized nature, such as physical education activities / skill classes (e. g., first aid, skiing, or golf), the general qualifications may differ from those established in subsection 5.1 or 5.2 if agreed upon by the Service Committee. It is also recognized that a discipline may contain one or more courses of such specialized nature that the general qualifications standards established in subsection 5.1 or 5.2 are not alone sufficient to indicate the level of expertise required for teaching. In such cases, the special expertise can be demonstrated by a) having verifiable special training in that course or the teaching of that course, b) having successfully completed at least one course in

that specialty, or c) having successfully completed seminars or workshops in that specialty.

5.5 In addition to meeting the general qualification required by subsection 5.1, 5.2, 5.3 or 5.4, an adjunct teacher must possess the specific course competencies requirements for a course that are published by the department no later than June 1 each year.

5.6 Adjunct teachers of an online course must be certified as having completed an administratively approved course in online facilitation appropriate for the offering.

5.7 The qualifications for teaching set forth in this Section may be modified by the mutual agreement of the parties.

5.8 The Board shall provide notice of all fulltime teaching vacancies as they appear on the college intranet and internet websites.

5.9 An adjunct instructor who possesses the qualifications for a newly created adjunct assignment in another department, area, or campus shall have the right to request consideration for an interview.

5.10 All newly-hired adjunct teachers are on probationary status for two (2) academic years or until they teach 22 equated credit hours, whichever is longer from the date of original hire. During this probationary period, the supervisor may remove the adjunct teacher from the roster of candidates or terminate employment and these actions shall not be the subject of a grievance, nor shall Section 7.3 apply.

## SECTION 6
## EVALUATION OF PERFORMANCE

6.1 The following procedures shall govern the observation and evaluation of an adjunct's performance of duties:

1. At the start of each term, an adjunct teacher shall be given the adjunct teacher evaluation form, the course syllabus, and the guidelines for the first day handout.

2. The immediate supervisor may authorize a full-time teacher in the area or department to observe the classroom performance of the adjunct teacher from time to time independently of the formal evaluation process described below. The full-time teacher shall notify the adjunct teacher of his or her intent to visit the classroom at least 24 hours in advance.

3. The immediate supervisor may formally evaluate the adjunct teacher from time to time (as provided in Appendix A), and may elect to have a full-time teacher in the area or department participate in the evaluation.  The immediate supervisor and the adjunct teacher shall mutually schedule the dates and times of classroom visitations for the purpose of evaluation unless there is reasonable cause for an unscheduled visitation.

4. The evaluation shall be reviewed with the adjunct teacher, who may elect to have an AAFMCC representative present during this consultation. The evaluation form attached to this Agreement as Appendix A shall be used to record the adjunct teacher's strengths and weaknesses. If improvements are needed, specific prescriptions and an accompanying timeline shall be presented to the adjunct teacher. The adjunct teacher may respond in writing to the evaluation and attach this response to the evaluation form for placement in the personnel file. To remedy any weaknesses, the adjunct teacher shall take advantage of any College resources that may be prescribed by the immediate supervisor.

5. All evaluative reviews shall be conducted in private and remain confidential.

6. A follow-up observation shall be made in accordance with the timeline presented.

7. Following the second observation, the immediate supervisor and the full-time teacher shall meet with the adjunct teacher and the AAFMCC representative to review the findings of the second observation. These findings shall be documented and contain the comments of those persons involved in the process.

8. An unsatisfactory rating by the immediate supervisor may result in the removal of the adjunct teacher from the roster of candidates or immediate termination of employment and shall not be the subject of a grievance. Just cause as provided in subsection 7.2 shall not be required in the event of termination because of an unsatisfactory evaluation.

6.2   An adjunct teacher may be required to administer student evaluations in each assigned section. These evaluations may be considered and used in an administrative evaluation under subsection 6.1. The results of such evaluations shall be recorded on and consistent with the applicable form. The parties may agree to change these forms by mutual agreement. The student evaluation forms will be distributed and completed during class time. Students will be allowed to complete and submit the forms anonymously.  The completed student evaluations will be returned in a sealed envelope to the appropriate administrative office.

## SECTION 7
## PERFORMANCE ISSUES AND MISCONDUCT

7.1   The immediate supervisor shall investigate concerns regarding the performance, conduct, or responsibilities of an adjunct teacher and shall take appropriate action, up to and including termination of employment and removal from the roster of candidates. Investigation may include classroom visitation without advance notice. The immediate supervisor shall document the termination of an adjunct teacher's employment or removal of an adjunct teacher from the roster of candidates.

7.2   Notwithstanding Section 6.1 and 7.3, an immediate supervisor may develop a written Performance Improvement Plan (PIP) for an Adjunct instructor. The PIP must include the areas of needed improvement, a plan for successfully meeting the requirements for improvement, and a time line for review of improvement. Should the immediate supervisor determine that the improvement required has not been obtained, the immediate supervisor may remove the adjunct instructor from the roster of candidates or immediately terminate employment and the decision shall not be the subject of a grievance.  Just cause as provided in Section 7.3 shall not be required in the event of a removal from the roster or a termination due to the failure to meet the requirements of a Performance Improvement Plan. When the improvement plan has been met any written documentation will be expunged immediately.

7.3   Except as provided in subsection 5.10, 6.1.8, and 7.2, discipline or discharge of an adjunct teacher may be only for just cause after charges, notice and hearing. All such charges shall be in writing, signed by the appropriate administrator, and filed with AAFMCC and the adjunct teacher.  The doctrine of progressive discipline shall be observed.

7.4   Disciplinary interviews of an adjunct teacher must be held in private and shall remain confidential. The teacher and the AAFMCC shall be notified at least one (1) calendar day in advance of the nature of such interviews and be informed of the right to AAFMCC representation. If the adjunct teacher chooses to have AAFMCC representation, the administration may elect to have representation present at the interview. AAFMCC shall be notified in writing of the nature and disposition of the case.

## SECTION 8
## TEACHING RIGHTS AND RESPONSIBILITIES

8.1   An adjunct teacher is entitled to freedom of discussion within the classroom on all matters that are academically relevant to course content as measured by professional standards. In performing teaching duties, an adjunct teacher shall:

- Uphold the best scholarly and ethical standards of his or her discipline.
- Demonstrate respect for students as individuals and adhere to his or her role as an intellectual guide and counselor.
- Make every reasonable effort to foster honest academic conduct and ensure that his or her evaluations of students reflect each student's performance.

8.2     An adjunct teacher is to teach his or her assigned classes and maintain appropriate records, including grades, in accordance with Board or administrative policy.

8.3     An adjunct teacher has a responsibility to try to achieve course outcomes and objectives and to cover course content as established by the full-time teachers in the area. The adjunct teacher also has the responsibility to provide each student at the beginning of the term a first-day handout that presents, but is not limited to, intended course goals or outcomes, potential grading standards and practices, a tentative schedule of assignments and tests, and any other information required by unit policy. These materials shall also be provided to the immediate supervisor.

8.4     An adjunct teacher shall use the textbook(s) selected for the course by the full-time teachers.

8.5     An adjunct teacher shall be available for student consultation.

8.6     An adjunct teacher shall avoid the impression of speaking or acting on behalf of the College when speaking or acting as a private person.

8.7     If College resources, materials and facilities are not used in the development of any product for the purpose of personal profit or gain, the product shall become the sole property of the adjunct teacher together with all attendant benefits. The use of College resources, materials and facilities for the development of any product for the purpose of personal gain may be undertaken only after agreement between the Board and the adjunct teacher.

8.8     Adjunct teachers may voluntarily participate in College social, cultural, and professional activities.

8.9     An adjunct teacher may not be required to contribute time or work in a department other than his or her own.

8.10   The Board shall provide at no charge year-round, conveniently located, well- maintained, lighted and patrolled parking lots limited to full-time and part-time staff.

8.11   An adjunct teacher shall be granted one (1) day of paid leave per assignment each term (Fall, Winter, and Spring/Summer).

8.12   The College shall make reasonable provisions for the health and safety of adjunct teachers while they are on the College's property or at facilities used by the College during the course of their employment. An adjunct teacher shall not be required to use any equipment that is in an unsafe condition to the extent that it would be likely to cause injury to a person.  An adjunct teacher shall be required to use safety equipment at all times when such equipment is provided by the College.

8.13   An adjunct teacher may participate in programs in the Professional Development Series without charge, especially as envisioned in subsection 6.1(3).

8.14   An adjunct instructor may request approval by his or her immediate supervisor for a leave of absence for professional development purposes for a period of no more than 3 years. Leave time must be continuous.  In order to be considered for professional development leave, the adjunct must submit a written request with documentation of the educational plan to the immediate supervisor 90 days prior to the start of the first semester of leave. Seniority will not accrue during a leave, however the instructor shall not be removed from the approved list of candidates on account of being absent from teaching during the leave.  Sixty (60) days prior to the return from professional development leave, the adjunct must provide proof of completion of the approved professional development activity to immediate supervisor.

**SECTION 9**
**PERSONNEL FILE**

9.1   There shall be only one (1), centrally located personnel file maintained for each adjunct teacher.

9.2   An adjunct teacher may add to his or her personnel file materials that attest to his or her proficiency and experience. When disciplinary or evaluative material is placed in an adjunct teacher's file, the adjunct teacher shall be furnished with a copy of the material and shall be permitted to write a rebuttal, which shall be attached to the original material in the file.

9.3     An adjunct teacher shall have the right, upon request, to examine and have copied the contents of his or her personnel file.  Confidential pre-employment credentials of an evaluative nature may be excluded from this review.

9.4     Reprimands shall be automatically removed from the personnel file after three (3) years if there has been no intervening discipline. After two years without intervening disciplinary matters, an adjunct teacher may petition HR to remove the reprimand from their personnel file.

9.5     Data confidentiality shall be promoted by limiting access to the personnel file to appropriate persons.

## SECTION 10
## WORKLOAD LIMITS

10.1    An adjunct teacher shall be limited to twenty-three (23) equated hours per calendar year, which shall be known as the "yearly hard cap", and no more than eleven and one half (11.5) equated hours in any one term.  A calendar year commences on January 1st of each year and ends on December 31st of each year.

10.2    At the discretion of the College an assignment may be made in excess of the term or yearly hard cap as set forth in 10.1

## SECTION 11
## CONFLICT OF INTEREST

11.1    As educational professionals, adjunct teachers recognize the importance of safeguarding their proper relationship with students and with the College.  To this end, it is unethical for an adjunct teacher to benefit from his or her employment to the detriment of a student or the institution. Accordingly, it is unethical for an adjunct teacher to:

    A.  Coerce or require students to join religious, political, business, charitable, professional, civic, or social organizations, provided that this example does not impair advocacy protected by the 1st Amendment. An adjunct teacher may, of course, recommend that his or her students join professional and/or academic organizations.

    B.  Coerce or require students to engage in a business transaction from which the adjunct teacher will profit.

    C.  Solicit or engage in a sexual act or unlawful activity with a student.

D. Compete with Macomb Community College offerings by a) soliciting or otherwise exerting pressure on students to avail themselves of such services or course offerings, or b) using a course syllabus or other instructional materials provided by Macomb Community College in teaching at other institutions.   However, it is entirely permissible for an adjunct teacher to teach at other institutions.

E. Disclose confidential information acquired by virtue of his/her position  to  a competitor of the College.

F. Accept any tangible or intangible property (unless de minimus) in return for an action or forbearance or the exercise of influence in a College matter.

The term "student" as used here is defined as a student who is currently enrolled in the adjunct teacher's class.

## SECTION 12
## GRIEVANCE PROCEDURE

12.1   A grievance is defined as an allegation by AAFMCC that there has been a violation of this Agreement. All written grievances shall be submitted on forms provided by the Board.

12.2   All discussions shall be kept confidential during the procedural stages of the resolution of a grievance.  Each party to this Agreement shall furnish to the other party any information in its possession that is necessary for the proper resolution of a grievance.

12.3   There shall be strict adherence to the time limits specified in this procedure except when a time limit, in any specific instance, is extended by mutual agreement of the parties. The failure of the Board to answer a grievance within the specified time limit shall automatically move the grievance to the next step in the procedure.

12.4   An aggrieved adjunct teacher shall be entitled to representation by AAFMCC at each step of the grievance procedure. This representation shall include all individuals designated by AAFMCC to appear on behalf of the grievant and AAFMCC. Similarly, the Board shall have the right to designate individuals to

appear on its behalf in addition to the administrators identified in subsection 12.6.

12.5  A grievance must be submitted at the appropriate step within twenty (20) work days from the date of the alleged violation or the date the cause of the grievance becomes known, whichever is later, and answered within twenty (20) days from the date it is submitted. A step may be bypassed if the administrator does not have jurisdiction over the cause of the grievance.

12.6  AAFMCC may initiate a grievance at step one by discussing the cause of the grievance with the immediate supervisor. If the grievance is not resolved through informal discussion with the immediate supervisor, AAFMCC may submit a written grievance to the divisional dean (step two). If the grievance is not resolved at step two, AAFMCC may submit the written grievance to the vice president for human resources (step three).

12.7  If the grievance is not resolved at step three, AAFMCC may file a demand for arbitration with the American Arbitration Association within twenty (20) work days from the date the answer was received at step three. A copy of this demand for arbitration shall be filed with the vice president for human resources as well. The selection of the arbitrator shall be in accordance with the rules of the American Arbitration Association.

12.8  The arbitral forum is intended to resolve disputes over the interpretation or application of the matters that are specifically covered by this Agreement and that are not excluded from arbitration. The arbitrator shall have no power to add to, subtract from, disregard, or modify any of the terms of the Agreement. The award of the arbitrator shall be final and binding on all parties. The Board and AAFMCC shall share the fees and expenses of the arbitrator equally. Any additional costs shall be paid by the party incurring the costs.

12.9  No restraining, coercive, discriminatory or retaliatory action of any type shall be taken against an adjunct teacher because of the teacher's desire to file, institute or participate in a grievance.

## SECTION 13
## SERVICE COMMITTEE

13.1  The AAFMCC representatives on the Service Committee shall be the president of AAFMCC and two (2) other AAFMCC members..
The Board representatives shall be the vice president for human resources and two (2) designees of the provost.

13.2  The Service Committee is a forum in which the parties may discuss and attempt to resolve mutual problems cooperatively. These problems may include, but shall not be limited to, clarification of the meaning of this Agreement and issues arising between the Board and AAFMCC that are not

covered by the articles of this Agreement. The deliberations and determinations of the Service Committee shall not preclude implementation of the grievance procedure or limit the proper authority of the Board or AAFMCC.

13.3   Either party may call a meeting of the Service Committee or, with the consent of the other party, invite support or staff personnel to attend.

## SECTION 14
## SEVERABILITY, SCOPE OF AGREEMENT, AND
## NO STRIKE / NO LOCKOUT PLEDGE

14.1   This Agreement is subject in all respects to the laws of the State of Michigan and the United States with respect to the powers, rights, duties and obligations of the Board, AAFMCC, and bargaining unit members. In the event that any provision of this Agreement shall at any time be held to be contrary to law by a court of competent jurisdiction from whose final judgment no appeal has been taken within the time provided for doing so, such provision shall be void and inoperative; however, all other provisions of this Agreement shall continue in effect.

14.2   In the event that any provision is held void and inoperative, the Board and AAFMCC shall enter into immediate collective bargaining negotiations at the request of either party for the purpose of arriving at a mutually satisfactory replacement.

14.3   This Agreement represents the full and complete understanding between the parties respecting the wages, hours, and terms and conditions of employment of bargaining unit members. Any matter outside of this Agreement shall not be deemed a part hereof. This Agreement shall supersede any existing rules, regulations, or practices of the Board or the administration that are contrary to or inconsistent with its terms.  The Board shall make no changes in wages, hours, or working conditions incorporated into this Agreement or institute any re-organization affecting such wages, hours, or working conditions except after good faith negotiations and agreement of the Board and AAFMCC.

14.4   AAFMCC and its officers, agents, and members agree that during the term of this Agreement there shall be no strikes, slowdowns, boycotts, work stoppages, or any other act that would interfere with the operations of the College. Any violation of the foregoing may be made the subject of disciplinary action or an action for damages. Nothing in this provision shall be construed to restrict the Board to any remedy it may otherwise have under law. The Board agrees that during the term of this Agreement there shall be no lockout of adjunct teachers.

## SECTION 15
## PAY RATES

15.1   Effective with the start of the Winter Term 2013 the pay rates per equated hour shall be as follows:

| Step 1 | Step 2 | Step 3 | Step 4 |
|--------|--------|--------|--------|
| $596.00 | $619.00 | $689.00 | $754.00 |

The rate for Step 9 shall be $913 per equated hour for the duration of this contract.

The pay rates for each equated hour per step shall increase by 1% for each of the following academic years:  2013/14, 2014/15, 2015/16, 2016/17 and 2017/18.

Step advancement shall be awarded pursuant to the contract beginning in Winter Term 2013.

15.2   For academic year 2012/13 only, the College shall make a payment to eligible adjunct teachers as follows:

100 through 199 equated credit hours $100.00
200 through 299 equated credit hours $200.00
300 equated credit hours or more $300.00

To be eligible for this onetime payment an adjunct teacher must work in the Fall Term 2012, Winter Term 2013 or Spring/Summer Term 2013.  An eligible adjunct teacher will receive only one payment regardless of how many terms they teach in academic year 2012/13.

15.3   The Board shall provide to AAFMCC a one-time payment of $30,000 to be used during the term of this contract to reimburse eligible adjunct teachers for a limited amount of credit and/or continuing education classes taken at Macomb Community College, but not registration and course related fees. Reimbursement will be at the In-district rate. The executive committee of AAFMCC will manage the program and establish the eligibility and the amount of reimbursement available to each participant. In the first semester that an adjunct teacher is no longer on the seniority roster, their eligibility to participate in this program shall end on the last day of the month of that semester. The participant shall pay all tuition and fees and apply for reimbursement with AAFMCC by the College's due date. Reimbursement of tuition will only be made upon successfully completing a credit class with at least a grade of C, and/or a continuing education class with satisfactory attendance and participation. The executive committee of AAFMCC will regularly review participation in this program and may modify eligibility and

amounts, and may expand participation to a dependent family member in the future.

## SECTION 16
## ASSOCIATION DUES / AGENCY SHOP

16.1    An adjunct teacher shall, as a condition of employment, 1) on or before thirty (30) calendar days from the first day of active employment or the effective date of this Agreement, whichever is later, join AAFMCC or 2) pay a service fee to AAFMCC. The service fee shall not exceed the amount of AAFMCC dues collected from AAFMCC members.  An adjunct teacher may authorize payroll deduction for such fee.  In the event that an adjunct teacher shall not pay such service fee directly to AAFMCC or authorize payment through payroll deduction, the Board shall, pursuant to MCLA 408.477; MSA 17.277(7) and at the request of AAFMCC, deduct the service fee from the adjunct teacher's wages and remit it to AAFMCC.

16.2    An adjunct teacher who is a member of AAFMCC, or who has applied for membership, may sign and deliver to the Board an assignment authorizing deduction of dues, assessments and contributions to AAFMCC as established by AAFMCC. Such authorization shall continue in effect from year-to-year unless revoked by the adjunct teacher.

16.3    Pursuant to this Section, the Board shall payroll deduct from each paycheck the dues, assessments, contributions and/or service fees determined by AAFMCC, which  shall inform the Board of the appropriate deduction for each adjunct teacher for each paycheck.

Amounts deducted as provided above shall be transmitted monthly to AAFMCC, along with the name of and respective amount(s) deducted for each adjunct teacher.

Within twenty (20) calendar days of hire, the Board shall inform AAFMCC of the name and job title of each newly hired adjunct teacher.
The Board shall give AAFMCC's forms to each new hire for payroll authorization of dues, assessments, contribution and/or service fee deduction. The Board shall promptly remit all signed and processed forms to the AAFMCC executive board.

16.4    AAFMCC accepts full responsibility for the authenticity of each authorization for the deduction of dues for teachers who fail to sign an authorization.  AAFMCC will indemnify and save College harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of any actions taken or not taken by College under the terms of this Agreement.  College shall

not be liable to AAFMCC by reason of the requirements of this Agreement for the remittance or payment of any sum other than those constituting actual dues, assessments, contributions and or service fee deductions made from wages earned by teachers, said deductions only to be made in accordance with this Agreement.

## SECTION 17
## TERMINATION AND MODIFICATION

17.1  This Agreement shall be effective as of March 19, 2013, and shall continue in full force through the end of Academic year 2017/2018  in August 2018.

17.2  Except as specifically noted herein, collective bargaining meetings between the Board and AAFMCC may be called during the term of this Agreement only through the request of one party and the consent of the other party for the purpose of negotiating amendments or modifications of the Agreement, but in no case shall these modifications or amendments become final until they have been ratified by the membership of the AAFMCC and the Board.

# [THIS SPACE INTENTIONALLY LEFT BLANK]

This agreement entered into this 19th day of March, 2013.

THE BOARD OF TRUSTEES OF THE
COMMUNITY COLLEGE DISTRICT OF
THE COUNTY OF MACOMB

By: _James J. Kelly_____
James Kelly
Its:  Chair

By: _____
James Jacobs
Its:  President

By: _Denise Williams_____
Denise Williams
Vice President, Human Resources

ASSOCATION OF ADJUNCT
FACULTY OF MACOMB
COMMUNITY COLLEGE

By: _____
Richard Filbey
Its:  President

By: _Jeffrey Kass_____
Jeffrey Kass
Its:  Vice President

By: _Jodi Monday_____
Jodi Monday
Its:  Secretary

By: _Gholam Azarbayejani_____
Gholam Azarbayejani
Treasurer

## Appendix A – Adjunct Faculty Evaluation Form

| | I.   Subject matter | Superior | Good | Satisfactory | Below Average | Poor |
|---|---|---|---|---|---|---|
| 1 | Were the objectives made clear and did they relate to the approved outcomes and objectives for the course? | | | | | |
| 2 | Did the instructor emphasize major concepts? | | | | | |
| 3 | Did the instructor provide examples to clarify content? | | | | | |
| 4 | Were students questioned to ascertain their grasp of the subject matter? | | | | | |
| 5 | Did the instructor appear to have organized the presentation carefully, prior to class time? | | | | | |
| | II.   Techniques | | | | | |
| 1 | Did the instructor encourage student discussion and student questions? | | | | | |
| 2 | Did the students appear to be reasonably prepared, indicating that the assignment had been clearly given? | | | | | |
| 3 | Did the instructor demonstrate skill in maintaining student interest and attention? | | | | | |
| 4 | Was the volume of work suitable to the length of the class period? | | | | | |
| 5 | Does the instructor use a variety of presentation strategies, including appropriate and available technology? | | | | | |
| | III. Presentation | | | | | |
| 1 | Was the instructor's voice clear and audible? | | | | | |
| 2 | Did the instructor use a vocabulary appropriate to the content and class level? | | | | | |
| 3 | Was the instructor free of distracting mannerisms? | | | | | |
| 4 | Did the instructor appear to be enthusiastic about the subject matter? | | | | | |
| 5 | Did the instructor appear to integrate discussion, questions, and the main body of the material in an organized fashion? | | | | | |
| | IV.  Student-instructor Interaction | | | | | |
| 1 | Did the students appear to feel at ease? | | | | | |
| 2 | Was there a reasonable amount of class participation? | | | | | |
| 3 | Did the instructor correct errors without embarrassing the students? | | | | | |
| 4 | Did the instructor lead the class without appearing dictatorial? | | | | | |
| 5 | Did the instructor create a climate of trust | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | and engagement among students while at the same time challenging them to think critically or creatively, about difficult concepts? | | | | | |
| 6 | Do student evaluations of this and other courses reflect favorably on the teacher's performance? | | | | | |
| | **V. Other professional duties** | | | | | |
| 1 | Was the First Day Handout provided to students which included the information required by the College? | | | | | |
| 2 | Does the instructor meet classes at the assigned days and times, and conduct class for the full assigned period? | | | | | |
| 3 | Is the instructor available to students outside of class, either in person or via email? | | | | | |
| 4 | Did the instructor make use of the Academic Alert system for at-risk students, complete and post grades on time, and conduct course assessments if required? | | | | | |
| 5 | Does the instructor engage in professional development to continually enhance skills and content knowledge? | | | | | |
| 6. | Are student complaints, if any, resolved in a manner appropriate to the nature of those complaints? | | | | | |

VI. **Summary of strengths and weaknesses:**

VII. **Prescriptions for improvement (if any):**

Signatures:

# Exhibit 4
# Letter of Termination,
# February 14, 2020

**Macomb**
**Community College**
Education • Enrichment • Economic Development

**Vice President for Human Resources**

Discover. Connect. *Advance.*

February 14, 2020                          SENT VIA EMAIL AND US MAIL

Glenn Bowles
11122 Lisa Lane
Shelby Twp., MI  48316

**RE:  Employment Status**

Mr. Bowles,

On June 4, 2019 your employment with the College was suspended following a complaint which included allegations regarding inappropriate behavior and tactics used by you during police and correction academy courses.  An outside investigation conducted by the College found your conduct inappropriate as an instructor of students at the College.  This conduct includes tickling, groin hits on male cadets, inappropriate comments of a sexual nature, and excessive use of force. Based on interviews with academy staff, students and a subject matter expert, the College finds that your tactics and behavior (tickling, touching, comments, level of force, etc.) during the Corrections Academy as well as the Police Academy were inappropriate and constitute grounds for termination.

Based on the circumstances noted above you were advised that the College was considering termination and you were afforded a Loudermill Hearing on Friday, February 14, 2020 to provide you the opportunity to respond to these findings. You were also offered the opportunity to review the summary of findings and to submit any additional evidence by end of day Monday, February 17, 2020, to which you declined.

In addition, the Michigan Commission on Law Enforcement Standards (MCOLES), the accrediting agency for the Macomb Community College Police Academy completed an investigation into allegations of inappropriate instructor behavior and has concluded, "Instructor Bowles has been deemed unfit to instruct in an MCOLES approved basic training academy."  You were also provided a copy of the MCOLES Investigative Summary relative to this conclusion.

We find it necessary to terminate your employment, effective immediately.  Please return all college keys, any college equipment you may have and your ID badge to the Department of Human Resources at 16000 Hall Rd, Clinton Twp., MI 48038 as soon as possible.

Sincerely,

Denise L. Williams
Vice President for Human Resources

# Exhibit 5
# Letter from AAFMCC to Bowles Indicating It Was Not Going To Grieve His Termination, February 28, 2020



# AAFMCC

AFT Local 6533

**Association of Adjunct Faculty of Macomb Community College**

February 28, 2020

Mr. Glenn Bowles

11122 Lisa Ln.

Shelby Township, MI 48316

We are writing to advise that AAFMCC has concluded that there is an insufficient probability of success to warrant support for a grievance challenging your separation from employment at the College.

The Union believes that it is more likely than not that an arbitrator will credit testimony of the complainants and that your separation will not be reversed. This conclusion was reached after a review of complainant's statements and your responses. Accordingly, your separation will not be grieved and will stand.

Regards,

AAFMCC Executive Board

P.O. Box 183017  Shelby Twp., MI  48317       aafmcc@gmail.com       313-680-6434       aafmcc.org

# Exhibit 6
# Letter From Bowles To Darga
# Demanding A Retraction

**GLENN BOWLES**
11122 Lisa Ln.
Shelby Township, MI 48316
grbctpd@yahoo.com


**Undersheriff Elizabeth Darga**

43565 Elizabeth Road
Mount Clemens, MI 48043
(586) 469-5151

Sent via email, first class mail, and certified mail return receipt requested.

Dear Ms. Darga:

You published a false statement against me, attached, that constitutes libel. As a precondition for me to collect exemplary and punitive damages for a lawsuit under Michigan law, I am required to demand a retraction of your libelous statement that: "*Our employees who were mistreated/victimized* by MCOLES certified instructor Glenn Bowles deserve an explanation of the findings by your agency." I never victimized or mistreated any cadet.

I am demanding a retraction of the above quoted false statement in the same manner it was made, and to the same individuals and entities it was made to. I am giving you until November 27, 2020 to do this. I am demanding  proof in the form of an email to my email address above, no later than November 27, 2020 that you have made the required retraction.

Below is the relevant part of the Michigan law covering retractions for libel, and your libelous publication.

Sincerely,

<u>/s/Glenn Bowles</u>

**600.2911 Action for libel or slander.**

Sec. 2911.

(b) Exemplary and punitive damages shall not be recovered in actions for libel unless the plaintiff, before instituting his or her action, gives notice to the defendant to publish a retraction and allows a reasonable time to do so, and proof of the publication or correction shall be admissible in evidence under a denial on the question of the good faith of the defendant, and in mitigation and reduction of exemplary or punitive damages. For libel based on a radio or television broadcast, the retraction shall be made in the same manner and at the same time of the day as the original libel; for libel based on a publication, the retraction shall be published in the same size type, in the same editions and as far as practicable, in substantially the same position as the original libel; and for other libel, the retraction shall be published or communicated in substantially the same manner as the original libel.

**From:** Elizabeth Darga <Elizabeth.Darga@macombcountymi.gov>

**Sent:** Wednesday, December 4, 2019 8:25 AM

**To:** Galloway, Gretchen (MSP) <GallowayG@michigan.gov>

**Cc:** Anthony Wickersham <Anthony.Wickersham@macombcountymi.gov>; Andrew McKinnon <andrew.mckinnon@macombgov.org>; Karlyn Semlow <karlyn.semlow@macombgov.org>

**Subject:** RE: MCOLES Investigation

Hello Gretchen,

I am requesting a copy of your completed investigation into the misconduct committed at the Macomb Police Academy. It has been almost five months since you interviewed our employees. Our employees who were mistreated/victimized by MCOLES certified instructor Glen Bowles deserve an explanation of the findings by your agency.

Thank you.

# Exhibit 7
# Letter Rejecting Demand For Retraction, November 17, 2020



**Mark A. Hackel**
County Executive

**CORPORATION COUNSEL**

November 17, 2020

Corporation Counsel
John A. Schapka

Assistant Corporation Counsel
Frank Krycia
Robert S. Gazall
Aaron C. Thomas
Peter C. Jensen

Glenn Bowles
11122 Lisa Lane
Shelby Township, Michigan  48316

RE:    Retraction of Alleged Defamation

Dear Mr. Bowles,

Your undated letter to Macomb County Undersheriff Elizabeth Darga was forward to my office for review and response.

I have thoroughly reviewed the facts and circumstances underlying your assertion that you are the victim of a defamatory communication.   Your claim is meritless.   You have not been defamed because there is no defamation in the truth.   Accordingly, there will be no retraction.

You are free to pursue any manner of civil remedy which you believe to be in your best interest. It is difficult, however, to understand why you would wish to see the details of your behavior to be scrutinized in a very public forum for all, including the media, to see.

Respectfully submitted.

John A. Schapka
Corporation Counsel

JAS/bhs